SAN ANTONIO & A. P. RY. CO. v. STUART.†
(No. 5480.)

(Court of Civil Appeals of Texas. San Antonio. June 16, 1915. Rehearing Denied July 3, 1915.)

1. DEPOSITIONS ☞68—EXHIBITS—IDENTIFICATION OF EXHIBITS.

Where exhibits to depositions are so described in the answers as to render their identity certain, or where their identity is conclusively established by extraneous evidence, they are admissible in connection with the depositions, although not inclosed therein.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 155–157; Dec. Dig. ☞68.]

2. DEPOSITIONS ☞83—EXHIBITS—SUPPRESSION OF DEPOSITIONS.

Where X-ray photographs were made exhibits to a deposition in a personal injury case, but were not returned in the same envelope, but were unnecessary to a proper understanding of the deposition, it was not error to refuse to suppress such depositions on the ground that they were unintelligible without the exhibits.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 219–226; Dec. Dig. ☞83.]

3. APPEAL AND ERROR ☞1051 — REVIEW — HARMLESS ERROR.

Admission of X-ray photographs as exhibits in connection with depositions in an action for injuries to plaintiff's leg while switching railroad cars is harmless error, where other expert evidence was given showing from such photographs that plaintiff's leg would improve and again become serviceable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. ☞1051.]

4. DAMAGES ☞206—PHYSICAL EXAMINATION.

In an action for injuries to plaintiff's leg while switching railroad cars, it was not error to refuse to allow physicians to examine the leg, except separately, the examiners to be placed on the stand by defendant, and before the jury, where each of such physicians had already made a thorough physical examination prior to the trial.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 531; Dec. Dig. ☞206.]

5. DAMAGES ☞206—PHYSICAL EXAMINATION.

In a personal injury case, where defendant's motion for a physical examination of plaintiff was denied, but no suggestion was made that plaintiff would utter exclamations of pain while being examined, and he had previously exhibited his injury to the jury, although defendant had a right to have physicians of its own selection make a proper examination, whether such examination could be made in the presence of the jury was to be determined by the nature of the injury sustained.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 531; Dec. Dig. ☞206.]

6. APPEAL AND ERROR ☞273—RESERVATION OF GROUNDS OF REVIEW—EXCEPTIONS.

In a personal injury action, an exception to the court's definition of "reasonable care"

on the ground that it was not correct is too general for consideration on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1590, 1606, 1620–1623, 1625–1630, 1764; Dec. Dig. ☞273.]

7. APPEAL AND ERROR ☞273—RESERVATION. OF GROUNDS OF REVIEW—EXCEPTIONS.

An exception to the charge in a personal injury case that plaintiff's theory of the case was presented and defendant's theory excluded is too general to entitle the assignment to consideration.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1590, 1606, 1620–1623, 1625–1630, 1764; Dec. Dig. ☞273.]

8. TRIAL ☞352—SPECIAL ISSUES.

In a personal injury case, a special issue as to whether plaintiff was knocked down and run over and injured was not objectionable as combining two issues.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 840–842, 844, 845; Dec. Dig. ☞352.]

9. TRIAL ☞351—SUBMISSION OF ISSUES.

An assignment of error on the ground that the court refused to submit certain issues will be overruled when such issues are elsewhere submitted.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 829, 834–839; Dec. Dig. ☞351.]

10. TRIAL ☞352—SPECIAL ISSUES—EMPHASIZING EVIDENCE.

Issues which are argumentative and on the weight of the testimony in singling out portions thereof are properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 840–842, 844, 845; Dec. Dig. ☞352.]

11. TRIAL ☞350—SPECIAL ISSUES.

Issues not made by the pleadings are properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. ☞350.]

12. TRIAL ☞350—SPECIAL ISSUES—DAMAGES.

Special issues as to damages, findings under which would be of no practical benefit on the question of whether the verdict is excessive, are properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. ☞350.]

13. TRIAL ☞350—SPECIAL ISSUES—SUBSIDIARY ISSUES.

The court is not required to submit special issues calling for findings on subsidiary questions of fact or evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. ☞350.]

Appeal from District Court, De Witt County; John M. Green, Judge.

Action by J. N. Stuart against the San Antonio & Aransas Pass Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellant. Carlock & Carlock, of Ft. Worth, and Davidson & Bailey, of Cuero, for appellee.

MOURSUND, J. This is a suit for damages for personal injuries sustained by appellee, a switchman in the employ of appellant. The trial resulted in a verdict and judgment for plaintiff. As no contentions arise in regard to the pleadings, the nature of the issues made thereby will be sufficiently disclosed by a statement of the substance of

the findings made by the jury in answer to special issues, in addition to their finding of the amount of damages suffered by plaintiff, as follows: That on the night of the accident to plaintiff and just prior thereto the foreman of the switching crew announced a plan of work to the effect that after putting the caboose of the freight train that had come in on the Waco main line in on the caboose track, the crew should kick the empty coal car in the rear of said train on to the lead track, and then kick or shove down depot No. 1 track others of said cars; that it was the duty of plaintiff, as long fieldman of said crew, to catch and secure the cars that were to be thrown in on said track under the plan of work, as it was then being carried out; that the plaintiff was knocked down on the lead track and run over and injured by one or more wheels of the coal car on said track running over his leg on the night of December 30, 1912; that plaintiff was knocked down and run over by reason of other cars being kicked or shoved up said lead track by other members of defendant's switching crew; that the short fieldman failed to throw the switch leading from the lead track to depot No. 1 track just before plaintiff was hurt; that such failure to throw the switch proximately caused the production of plaintiff's injuries; that such failure to throw the switch constituted negligence; that the switch lights were not burning on the switch stands where the switch engine was handling the cars at the time of the accident to plaintiff and the lead track where plaintiff claimed to have been injured; that it was negligence on the part of defendant not to keep and maintain said switch lights burning at said switch stands; that such failure to have the switch lights burning proximately caused or contributed to cause the production of plaintiff's injuries; that plaintiff was in the discharge of one of the duties of his employment when he sustained the injuries; that plaintiff exercised such care as a man of ordinary prudence would have used under similar circumstances to carry out the instructions of Dr. Reuss as to care and exercise of the injured leg.

[1] By the first assignment complaint is made of the overruling of defendant's motion to suppress the deposition of H. L. Warwick, taken on behalf of plaintiff, and filed June 4, 1914, for the reason that the exhibits, which consisted of two X-ray alleged photographs of plaintiff's leg, were not inclosed in an envelope with said deposition, but were placed in a separate envelope, which was unsealed and open, and not directed to the clerk of the district court of 'De Witt county, Tex., and because the depositions of the witness are with reference to, and are based upon, said photographs to such an extent as to render said depositions unintelligible in the absence of said exhibits. The second assignment complains of the admission in evidence of the two photographs

referred to in the first assignment of error. The statement under these assignments discloses that the photographs were so large that they could not be put in the regular deposition envelope used by the notary, and that they were put in a large envelope, which was attached to the deposition envelope, but was unsealed. The evidence conclusively showed that the photographs were the ones referred to in the depositions. No contention was made that they were not the same ones. The photographs were marked Exhibits Nos. 1 and 2, and bore the signature of the notary public who took the depositions, which signature was proved up. The one marked Exhibit No. 1 had written on it the words, "J. N. Stuart, Right Leg, 5—18—14," with initials appearing to the witness to be "H. W." On the other one was the same statement, but the initials appeared to the witness to be "H. W. W." The statement does not contain the substance of the testimony contained in the deposition, nor is any attempt made to show in what respect the testimony was prejudicial to appellant. The testimony contained in the deposition is brief. It is to the effect that on May 18, 1914, Warwick made two X-ray pictures of plaintiff's right leg; that he attached the pictures, marking them respectively No. 1 and No. 2, and having the notary mark them for identification; that when he took picture No. 1 Stuart was lying on his back on the table with the plate underneath the back of his leg and the X-ray machine above; that when No. 2 was taken Stuart was sitting in a chair with his leg rotated, and the plate beneath the side of his leg; that from the conditions of the leg as disclosed by the pictures mentioned he found that there is a fibrous union of the tibia (the large bone of the leg below the knee in the front portion of the leg) and a fibrous and bony union of the fibula (the small bone in the rear portion of the leg), and a bony spiculæ and fibrous attachments extending from the lower third of the tibia and attached to the lower third of the fibula; that the bones are not in alignment. In addition, the witness testified to matters showing his qualifications as a surgeon and his experience in the taking of X-ray photographs.

Our statute is silent in regard to exhibits to depositions. While it is usual to inclose the exhibits with the answers and interrogatories, it is not necessary to do so. If they are so described in the answers as to render their identity certain, or if their identity is conclusively established by extraneous evidence, they are admissible in connection with the depositions. Pope v. Anthony, 29 Tex. Civ. App. 298, 68 S. W. 521; Toby v. Oregon, Pacific Ry. Co., 98 Cal. 490, 33 Pac. 550; Bird v. Halsey (C. C.) 87 Fed. 674; Crosswhite v. Brewing Co., 10 Ala. App. 425, 65 South. 298; 4 Jones on Ev. (Blue Book Ed.) p. 219.

[2] But, regardless of whether the photographs were admissible as a part of the dep-

ositions, they were not so necessary to an understanding of the witness' testimony descriptive of the condition of plaintiff's leg as to render such testimony inadmissible, and justify the suppression of the entire deposition. Crosswhite v. Brewing Co., supra. While it has been held that the opinion of an expert is the best evidence of what is shown by an X-ray photograph (see Marion v. Coon Constr. Co., 157 App. Div. 95, 141 N. Y. Supp. 647), it may be doubted whether any other rule should be applied thereto than the one aplied to ordinary photographs, namely, that the photographs constitute the best evidence of what they contain. But in this case no objection of this character was urged against the admission of the depositions. It was merely contended that without the photographs the testimony was unintelligible, which contention is without merit, for the witness states the condition of the bones so that a jury would understand it better than if they, without any explanation, looked at the photographs.

[3] But, even if it were conceded that neither the depositions nor the photographs should have been admitted, we conclude that their admission was not such an error, in view of the evidence given by other parties, as requires a reversal of the judgment. Many physicians testified in the case, and the testimony of all of them showed the condition of the bones to be as shown in the photographs in so far as alignment was concerned, as well as the nature of the breaks. Dr. Talbot, a witness for defendant, who had examined plaintiff's leg about December 30, 1913, referring to the photographs, testified that they represented the position of the bones in plaintiff's leg correctly. He also testified that the pictures did not show that the ankle was ankylosed; that the only way of telling whether ankylosis existed was by the X-ray. Again, he testified there was absolutely nothing in the picture to show that plaintiff could not use the ankle. This witness also testified that the photographs showed that the small bone was united by a callous material, and the large one was partially united, and he estimated that within six months after the photographs were taken the bony union would be complete.

Dr. Reuss, defendant's witness, who operated on plaintiff and removed the broken bones, when the leg was first injured, also testified in regard to the photographs, stating that from what he understood to be the condition of the leg when plaintiff left the hospital, and from seeing the X-ray picture No. 1, he would consider that the bones were pretty fixed and firmly united, but not as straight as they were before they were broken.

Dr. Lackey, another witness for defendant, testified that the photographs showed 75 per cent. of a union in the big bone, and a complete union of the small bone, and showed that there was no overlapping of the bones.

Aside from the testimony of Dr. Warwick, hereinbefore stated, plaintiff had no witnesses who testified concerning the photographs. They were apparently used by defendant to good advantage. This is practically admitted in another portion of appellant's brief, wherein the statement is made that appellant's witnesses Drs. Reuss, Lackey, and Talbot claimed that a bony union has nearly formed in plaintiff's leg, and that he would have a serviceable working leg; and they claimed that this was shown by the X-ray photographs introduced in evidence by plaintiff, and as to which plaintiff's physicians did not testify, except the man who took the photographs, and that he merely described them. The assignments of error are overruled.

Plaintiff, while testifying, bared his leg and exhibited the same to the jury, and while it was so exhibited testified as follows:

"In regard to whether I have ever had any thing wrong with either of my legs before that time will say, 'No.' The injury shows for itself, three or four inches above the ankle; right here (indicating). Yes; the scars are there now; this place here (indicating) and under the side, where the last piece of bone worked out. This happened about a month and a half, or a little longer; there is a piece of bone coming out here. I can tell from the feeling of it; it feels like a piece of glass or thorn. This place here (indicating) hurts pretty bad; there is the end of a bone there; that skin scales up there and peels off, and then scales off again. I can work the leaders in my leg down to there (indicating). The position my foot stands in is down. That leg is shorter than the other. I cannot work my toes on that foot, nor can I raise that foot from the ankle. My foot is painful to me all the time. If I put any weight on it it feels like the bone was going out at the sides, as near as I can describe it. I have not put any weight on it, except some time when I go to sit down I let it touch the floor, and maybe put a pound or two of weight on it then. When I do, I imagine it feels about the same as if the bone was going out of the side of it. I think that is my shin (indicating). Yes; there is a shortening of several inches, about the width of the car wheel; I think that was what ran over it. When I left the hospital it was bandaged up; that is, it was in a cast, and the bandage was over the cast. As to the difference between the condition of the leg now and when I left the hospital on July 19th, at the time I left there it was limber at the break, and would drop down if I let it, and I begged the doctor not to turn it loose, and he moved it and twisted it that from the time it kind of healed over and quit running pus up to the present time. It is not possible, nor has it at any time been possible, since the injury, to use that leg in any serviceable way. I cannot use it at all. It is not a bit of use that I know of. It just hangs there and aches all the time, and God knows I would walk on it if I could."

[4] Thereupon defendant filed a motion requesting that plaintiff be required to reexhibit his leg, and submit to physical examination of same by defendant's witnesses Drs. Reuss, Lackey, Brown, Frobese, Muegge, and Talbot, all of whom had examined plaintiff's leg, but at periods separated from the day of trial by from 8 to 18 months. The court inquired to what extent plaintiff's attorneys resisted the motion, whereupon one of the attorneys for plaintiff replied:

"The motion does not specify any time or place where the examinations should be had or conducted. We have no objection to their examining this man in the courtroom and in the presence of the jury. I do not care whether before they take the stand or while they are on the stand, or what period of the examination it is done, provided they let only one man at a time examine him."

The court then said:

"You may do that—have either or all of them examine him separately, as they are witnesses, before the jury. The motion as presented is overruled."

The defendant excepted to the overruling of the motion with the qualification made by the court.

Thereupon defendant presented in writing a motion asking the court to appoint three or more reputable physicians and surgeons of De Witt county to make an examination of plaintiff's leg. The court overruled this motion, stating that the right to examine plaintiff's leg would be granted to any physician defendant might introduce as a witness. Thereupon one of the attorneys for plaintiff asked the following question:

"We will have to put them on the stand before they will be permitted to examine the plaintiff?"

To which the court replied: "Yes." Thereupon counsel for plaintiff said:

"We do not object to letting him stand out there in the presence of the jury and examine the plaintiff, and then, if they do not want to use him as a witness, they need not."

Counsel for defendant replied:

"We have the court's ruling. We want our exception noted."

The overruling of these motions and the refusal to permit the examination except as stated by the court is assigned as error by means of the third, fourth, and fifth assignments of error.

The bill of exceptions also shows that subsequently counsel for plaintiff, while cross-examining Dr. Talbot, a witness for defendant, asked him to examine plaintiff's leg, whereupon counsel for defendant interposed, stating that an examination in the courtroom and in the presence of the jury was unsatisfactory, and defendant objected to it being made. The court then said:

"I will not insist that the doctor examine this man's leg, in view of the opposition of plaintiff to the examination proposed, which the court holds to be right, but, if the doctor does not think that he can make a satisfactory examination here, the court will not compel him to make an examination."

Thereupon counsel for plaintiff asked the witness:

"Can you tell by examining the man here what his condition is?"

To which the witness answered:

"No; I think it would be unsatisfactory; I would not attempt it."

On cross-examination he was again asked:

"Do you or not decline to take up this man's injured leg and examine it?"

To which he replied:

"No; I would not like to do it unless I had him with the other physicians at a private room where I could go into the case thoroughly. I would not like to do it in open court."

Dr. Lackey, who assisted in the first operation on plaintiff's leg, and saw it at times until plaintiff left the hospital, which was about July 19, 1913, was asked by plaintiff's counsel, on cross-examination:

"Can you examine him (Stuart) here, and settle that question about ankylosis?"

To which he replied:

"I am satisfied there would be ankylosis and pain, too, probably."

The witness was then asked:

"You could tell by looking at it here, could you not?"

To which he answered:

"Not without examining the foot and making a thorough examination."

He was then asked:

"You could look at it here in the presence of the jury and tell about it as well as anywhere else, could you not?"

His answer was:

"I suppose so, if he would submit to it."

Dr. J. H. Reuss, witness for defendant, testified, in effect, that he was the physician who had charge of plaintiff's case during his entire stay at the hospital in Cuero, and that the last time he examined the plaintiff's leg was in Ft. Worth, Tex., in October, 1913. On cross-examination of this witness the following questions and answers occurred:

"Q. If these muscles and ligaments at this part of the leg die out and have grown against the leg, would that account for the stiffening? A. Do you mean the stiffening in the ankle? Q. I mean would it account for the foot being in that position and for his inability to work his toes? A. He can work his toes. Q. He can? A. Yes. Q. I will give you an opportunity to show the jury. A. He could work them the last time I saw him. Q. Do you want an opportunity to show the jury he can work his toes? "Mr. Vandenberge: We would like to have him in accordance with the motion. "Mr. Carlock: You can have him for examination here in the presence of the jury. "Mr. Vandenberge: If we are going to examine him we want to examine him right. "The Court: The court adheres to his original ruling. "Q. Could you take this man here before the jury and show them whether or not he can move his toes? A. Not here; but I think I could in my office or any place where I could have the proper supplies, an electric battery, etc. I think I could do it. Q. You do not want to do it here? A. I will do anything that I am instructed to do; I am not here for any motive except to tell the truth and act the truth according to my best knowledge and belief."

It is apparent that all that portion of the bill of exceptions relating to what occurred when defendant's witnesses Talbot, Lackey, and Reuss were being cross-examined relates to rulings favorable to appellant, made when counsel for plaintiff was trying to get said witnesses to examine plaintiff's leg. The testimony of these witnesses on the issue whether a proper examination could be made in the presence of the jury was not before the court when he made the rulings complained of in the assignments now being considered. Said motions were not renewed, and

at the time they were made no contention was made or proof offered to the effect that a proper and reasonable examination could not be made in the presence of the jury. No suggestion was made at that time that plaintiff would probably utter exclamations indicative of pain while being examined, but when Dr. Talbot was testifying that suggestion was made. If the testimony of the three witnesses had been given on the issue when it arose as to whether the court was tendering the right to make a proper examination, it would have presented an issue to the court upon which the testimony was conflicting, and of such character as to support a finding that a proper examination could be made in the presence of the jury.

[5] Plaintiff having exhibited his injured leg to the jury, defendant had the right to have physicians of its own selection make a reasonable and proper examination of such leg, under the direction of the court. G., H. & S. A. Ry. Co. v. Chojnacky, 163 S. W. 1011; H. & T. C. Ry. v. Anglin, 99 Tex. 349, 89 S. W. 966, 2 L. R. A. (N. S.) 386. Whether a reasonable and proper examination can be made in the presence of the jury must be determined by the nature of the injuries alleged to have been sustained. For instance, a proper examination of the eyes might require a dark room and apparatus not practicable to be brought into the courtroom. If it be made to appear to the court that a proper and reasonable examination cannot be made in the presence of the jury, it would be the duty of the court to permit such examination to be made elsewhere. Houston & T. C. Ry. Co. v. Bukowsky, 175 S. W. 477. In the instant case it appeared from the first motion that each of defendant's witnesses had examined plaintiff's injuries, and each was thoroughly familiar with the nature thereof. The evidence shows that the plaintiff was taken from the place of the accident forthwith to the defendant's hospital at Cuero, where he was kept under the control and ministration of the defendant's surgeons for a period of nearly seven months, leaving the hospital on July 19, 1913; while there the defendant had taken several X-ray photographs of the plaintiff's injured leg, performed two or more operations upon the same, and had had all opportunity for study and examination of the extent of plaintiff's said injuries; that in October, 1913, plaintiff, at the request of Dr. Reuss, the defendant's chief surgeon, met him by appointment in Ft. Worth, and there submitted to a thorough examination of his said leg by said physician. Again, on December 30, 1913, the claim agent for the defendant, Mr. Ernest, requested the plaintiff to submit to an examination of a disinterested physician selected by the defendant, to wit, Dr. Lyle Talbot of Ft. Worth, Tex. This the plaintiff agreed to, and by appointment went to the said physician's office on said date and submitted to a thorough examination at the hands of said physician, who appeared and testified on the trial of the case in behalf of the defendant. We are of the opinion that he could not be required to submit himself to another X-ray examination, and it was not proposed that he should do so. For that matter, plaintiff introduced in evidence two X-ray photographs of the injured leg taken about three weeks before the trial, which were used by defendant to good advantage; its witnesses testifying to the condition of the leg as shown by the photographs. The witnesses could have made the same kind of an examination of the leg in the presence of the jury, as they had theretofore made upon other occasions. We do not think he could be required to submit to the use of an electric battery upon his person, or required to submit to the administration of an anæsthetic. It may be true, as suggested by counsel for appellant, that examination before the jury may develop into a controversy between the injured person and the physicians, and that suffering may be simulated, and the probability of this occurring should be taken into consideration by the court. In this case, although each physician mentioned in the motion had examined plaintiff's leg, no testimony was adduced to show that such examinations had resulted in a controversy between plaintiff and the physicians, or that plaintiff had made exclamations indicating suffering, nor was it shown that the examination would necessarily result in causing pain to plaintiff. It would be better in most cases to have the jury withdrawn while the examination is being made, but it cannot be said that in all cases this must be done if requested. To require the examination to be made in the presence of the jury over the protest of parties may require a reversal when such examination causes such suffering as to elicit from the injured party signs and exclamations calculated to arouse the prejudice of the jurors. But in this case we do not think the bill of exceptions shows that the court erred in overruling the two motions, with the qualification thereto announced by the court. In this connection we will say that the ruling of the court is sought to be construed as requiring defendant to examine the expert witnesses after they had examined plaintiff, without giving an opportunity to consult with them regarding the questions to be asked. We do not so understand the ruling of the court, and plaintiff's counsel made it plain that they were not insisting upon any such rule, for they stated that if, after examining the plaintiff, defendant did not want to use the witnesses, they need not do so. The assignments are overruled.

[6] By the sixth assignment complaint is made of the overruling of an exception to the court's definition of ordinary care. The exception was to the effect that the definition was not correct. It is obvious that the

objection to the charge was too general. The court should be informed what the objection is, not merely that there is an objection. The assignment is overruled. T. & N. O. Ry. C° v. Petersilka, 176 S. W. 70.

[7] The seventh assignment complains of the overruling of the following exception to the charge:

"This defendant excepts to all of said issues as framed by the court and submitted in said charge, considered as a whole, because the effect of said issues is to submit to the jury the plaintiff's theory of this case alone, and to exclude the defendant's theory of this case, and all of the same constitute a purely unilateral presentation of this case to the jury."

This exception is also so general that the assignment should not be considered. The assignment is followed by a statement, and three propositions which relate to the right to have material issues submitted, and are not relevant to this assignment. We gather from the assignment that appellant's real objections to the charge as given were as follows: (1) That the answer "Yes" to all issues except the seventh and those relating to damages and deduction for contributory negligence, would determine the issues in favor of plaintiff; (2) that the evidence did not raise issues Nos. 1, 2, 7, and 10. These objections were not communicated to the court, and cannot be urged under the general objection above set out. We conclude that the assignment is without merit.

[8] The eighth assignment complains of the overruling of an exception to the third question embodied in the charge. The issue was as follows:

"State whether or not the plaintiff was knocked down on the lead track and run over and injured by one or more wheels of the coal car on said track running over his leg, on the night of December 30, 1912. Answer 'Yes; he was,' or 'No; he was not.'"

The objection was that two issues are combined in the question, and that the question was asked whether one or more car wheels passed over plaintiff's leg, when he testified that two wheels passed over his leg, and alleged that the wheels of the car ran over his leg. There is no merit in these contentions. The facts inquired about are so closely related to each other that it was unnecessary to separate them into distinct questions, and the jury had to find all such facts in order to return an affirmative answer. Plaintiff had alleged that he was injured in the particular manner inquired about, except that his allegation was that car "wheels" ran over his leg. Only the substance of the issue need be proved, and proof that one car wheel passed over the leg would be sufficient under the allegation. We conclude there is no merit in the assignment and it is overruled.

The ninth assignment complains of the overruling of an exception to special issue No. 3A, which reads as follows:

"In case you have answered issue No. 3 in the affirmative, then state whether or not plain-

tiff was knocked down and run over by reason of other cars being kicked or shoved up said lead track by other members of defendant's switching crew."

The exception to this issue reads as follows:

"The defendant excepts to issue 3A as embodied in the court's charge, because again in said issue the jury are requested to state whether or not plaintiff was knocked down and run over, which emphasizes the error pointed out in seventh objection to third issue."

The objection was not well taken. The jury was not asked to again pass on the issue whether plaintiff was knocked down and run over by the coal car, but was asked, if they found that to be the fact in answer to special issue No. 3, then to state whether this occurred on account of other cars being kicked or shoved up the lead track by other members of defendant's switching crew. The assignment is overruled.

[9] The tenth assignment is overruled because the issue which the court refused to submit was submitted in issues Nos. 3 and 3A. When said issues are taken together they required the jury to find: First, whether plaintiff was knocked down and run over by the coal car; second, whether this occurred on account of other cars being kicked or shoved up the lead track. Surely it was not necessary to ask the specific question whether the cars so shoved collided with the coal car. The assignment is overruled.

The eleventh assignment is based upon the refusal of the court to require a finding whether two wheels of the car ran over plaintiff's leg. The court had asked the jury to find whether one or more wheels ran over plaintiff's leg, and, having held that said question was not objectionable because it failed to restrict the inquiry to two wheels, it follows that this assignment must be overruled. The twelfth assignment relates to the same matter, and is also overruled.

[10] The thirteenth, fourteenth, and fifteenth assignments are overruled. The issues refused were argumentative and upon the weight of the testimony in singling out certain portions thereof in a manner which would probably give the jury the impression that such facts were considered by the court to be entitled to special consideration and weight.

[11] The sixteenth assignment is based upon the court's refusal to submit the following special issue:

"Do you believe Dr. Reuss' treatment of the plaintiff was skillful, or was unskilled and improper? Answer, indicating which."

No such issue was made by plaintiff's pleadings, and the court did not err in refusing to submit the same.

[12] The seventeenth, eighteenth, nineteenth, and twentieth assignments are overruled. The seventeenth complains because the court refused to submit the issue whether plaintiff would have a working leg; the

eighteenth, what period of time would elapse before the leg would be serviceable; the nineteenth, how long it would be before there would be a complete bony union of the large bone of plaintiff's leg; the twentieth, whether plaintiff's leg should be amputated. The defendant's purpose evidently was to ascertain whether the jury, in fixing the amount of damages, did so upon the theory that plaintiff would be benefited by having an amputation performed, or upon the theory that the injured leg would grow sufficiently strong and useful to make it best not to amputate. Suppose in this case the jury has found that plaintiff would ultimately have a working leg, and that it should not be amputated, what benefit would appellant have derived from the answers. It would be contended before the trial court and this court that the verdict is excessive, and the argument made that the jury found it was unnecessary to amputate the leg. This would still leave the question open as to what extent plaintiff would be better off with the "working leg" than with an artificial leg, and when the testimony is examined it is evident that the jury could have decided in favor of the usefulness, and benefits to be derived from having the "working leg" by such a slender margin as to make it practically negligible in assessing the amount which would compensate him for his injuries. The jury might have found that, even if the leg would grow strong enough to make it advisable to keep it, still it would not permit the performance of the duties of his former occupation, and that his earning capacity would be diminished just as much as if it had been amputated. Such a finding would have been of no practical benefit to the court or to this court in considering the question whether the verdict is excessive.

[13] But, aside from that proposition, we do not think the court is required to submit issues calling for findings upon subsidiary questions of fact such as those inquired about in this case. To permit that to be done would cause many mistrials on account of the failure of the jury to agree upon some minor issue closely contested, and the solution of which has little or no effect upon the general issue of the amount to be awarded. We have heretofore condemned the submission of a multitude of questions relating to evidentiary issues, and need not repeat what was then said. The jury should not be subjected to a cross-examination for the purpose of obtaining their views upon each item of evidence. The assignments are overruled.

We do not think it can be said that the verdict is so excessive in view of the facts proven as to justify us in holding that it is the result of passion or prejudice. We therefore overrule the twenty-first assignment, wherein it is contended that the verdict is excessive.

The judgment is affirmed.